_____
Honorable Gary Spraker
United States Bankruptcy Judge

Entered on Docket
August 21, 2020

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:                                          )    Case No.: 11-21229-gs
                                                )    Chapter 13
ANTONIO F. POLVOROSA,                            )
                                                )
_____Debtor._____    )

### MEMORANDUM DECISION

As part of his successful chapter 13 bankruptcy case, debtor Antonio Polvorosa paid his secured creditor over $50,000.00 to cure prepetition arrears on his home loan. But after he received his discharge and this court closed his bankruptcy case, there remain questions surrounding the accounting of that loan. Polvorosa claims that the loan servicer at the time of his discharge, Ocwen Loan Servicing, LLC (Ocwen), violated his discharge injunction. He seeks a determination that Ocwen is in contempt of either the confirmed plan, the discharge, or both. Based on the alleged contempt he requests damages, including punitive damages, for the resulting harm. Ocwen denies violating the discharge injunction and further denies committing any of the accounting errors raised by Polvorosa. Ocwen alternatively argues that any alleged errors do not rise to the level of civil contempt. As a result, the court must reconcile Ocwen's accounting with Polvorosa's bankruptcy to determine whether the secured creditor attempted to collect a discharged debt in violation of the discharge injunction.

For the reasons stated below, the court finds that Ocwen did not violate the discharge injunction, and has not commited contempt of any court order.

**FACTS**

**A. The Confirmed Chapter 13 Plan.**

Polvorosa filed his voluntary chapter 13 petition on July 17, 2011 (Petition Date), largely to address over $50,000.00 in arrears owed on a mortgage loan secured by his residence at 9591 Hawaiian Summer Street, Las Vegas, NV (Property).  (ECF No. 1, p. 11 of 52).  At the time he filed his bankruptcy case, GMAC Mortgage (GMAC) serviced the deed of trust loan collateralized by the Property.  (ECF No. 1, p. 17 of 52).  In its Proof of Claim No. 3 (POC 3), GMAC listed $54,933.02 in total arrears as of the Petition Date, comprised of $48,160.50 in monthly mortgage payments and $6,777.52 in "other charges."  (Tr. Ex. 97).  GMAC represented in POC 3 that Polvorosa had missed eight monthly payments of $2,871.12 for March 2010 through October 2010, and nine monthly payments of $2,799.06 for November 2010 through July 2011, the month he filed his chapter 13 case.

In Section 2.12 of his chapter 13 plan, as subsequently amended, Polvorosa proposed $1,390.00 in monthly payments administered through the plan to cure the prepetition arrears owed to GMAC.  He also proposed to make ongoing post-petition payments of $2,846.00 a month directly to GMAC outside of the plan.  (ECF Nos. 2, 33 & 46).  The bankruptcy court confirmed  Polvorosa's plan number 3 (Confirmed Plan) on February 29, 2012 (Confirmation Order) (ECF No. 52).  A few months later, on May 14, 2012, GMAC and certain of its affiliates filed their own voluntary chapter 11 cases in the Bankruptcy Court for the Southern District of New York at Case No. 12-12020.  (Stipulated Facts, ECF No. 217, ¶ 6).  During that chapter 11 bankruptcy, Ocwen obtained the loan servicing rights from GMAC through a subsequent sale of, among other things, Polvorosa's mortgage loan.[1]

---

[1] On November 21, 2012, the Bankruptcy Court for the Southern District of New York entered an order in GMAC's bankruptcy case "approving the sale of certain notes and trust deeds, and mortgage servicing rights for those notes and trust deeds, to Ocwen." (Stipulated Facts, ECF No. 217, ¶ 7).  This sale closed on February 15, 2013.  (*Id*. at ¶ 8).  Ocwen, therefore, began servicing the loan as of February 2013.  (*Id*. at ¶ 9).  On March 23, 2013, a "Transfer of Claim Other Than For Security" was filed, indicating that GMAC transferred its secured claim to Ocwen.  (ECF No. 80).  A similar notice was also filed on June 9, 2014.  (ECF No. 89).

Critical to understanding the problems that arose, GMAC—and subsequently Ocwen—continued to apply every post-petition payment received either through the plan or directly from Polvorosa to the oldest outstanding balance. This precipitated the accounting issue that confronts the court in the instant matter, as neither the monthly plan payments nor the direct plan payments were, when considered alone, enough to fully pay off the oldest monthly payments of $2,871.12 as confirmed by both GMAC's and Ocwen's ledgers. To address this issue GMAC and Ocwen used a suspense account to hold funds that were short of the full amount of the earliest outstanding monthly payment. Thus cure and maintenance payments made under the Confirmed Plan were often placed into the suspense account.[2]

Eventually, however, the amount of Polvorosa's direct maintenance payments increased—presumably due to an increase in taxes, insurance, and related escrow charges. These increased direct maintenance payments exceeded the oldest outstanding monthly payment reflected on GMAC's and/or Ocwen's ledgers and began generating small balances that increased the suspense fund. Overall, the applicable Payment History[3] ledger reflects that the suspense account would fluctuate from a low of approximately $1,500.00 to more than $20,000.00 when Ocwen received the final lump sum payment under the Confirmed Plan.

**B. The Payment History Under the Confirmed Plan.**

In their briefing the parties disputed the amount of payments received under the Confirmed Plan and the manner in which such payments were applied to Polvorosa's account. After the conclusion of the hearing, however, it is clear to the court that Polvorosa does not seriously dispute the Payment History. Instead, during the evidentiary hearing and in his post-trial brief, Polvorosa focused on particular incidents that took place during the plan period. He contends that he tendered a number of payments to his lender, whether it be GMAC or Ocwen, that were not applied. He argues that such payments must be applied to fill the deficiencies

---

[2] For example, out of $4,035.25 GMAC received on March 7, 2013, its accounting shows that $2,871.12 was used to pay the delinquent September 1, 2010, mortgage payment while the remainder was placed into the suspense account.

[3] The Payment History identifies the monthly maintenance payments as "Borrower Payments" and the payments through the Confirmed Plan as "Pre-Petition Payments."

reflected in the Payment History.  Given the emphasis placed on the accounting during the hearing, some detail is warranted.  For reasons explained below, the exact amount of the deficiency is not as important as the fact that the parties agree that there was some deficiency at the time Polvorosa received his discharge.

Ocwen's accounting shows that Polvorosa did not make his post-petition maintenance payments to GMAC in 2012 for the months of January, March, April, June, August and September.  (Tr. Ex. 95).  Polvorosa agrees that he failed to make the pre-confirmation January 2012 and the post-confirmation April 2012 monthly maintenance payments to GMAC. (Stipulated Facts for Trial, ECF No. 217, ¶ 17).  However, he disputes that he missed the March 2012 payment.

The Payment History also shows that Polvorosa did not make the maintenance payments for June, August and September 2012.  These missing payments received considerable attention at the hearing. The evidence presented demonstrated that Polvorosa tendered cashier's checks to GMAC for each of these three months (collectively, the Stop Code Checks).  Beginning with the June 2012 payment, GMAC's customer log for Polvorosa's account contained entries reflecting the receipt of the Stop Code Check.  (Tr. Ex. 83, Bates 3083).  The customer log also reflects that GMAC was "unable to post it due to STOP CODE 2=1.  Please advise if funds should be posted or returned."  (*Id.*).  Benjamin Verdooren—a senior loan analyst with Ocwen—explained during the hearing that:

> [a] stop code is just a code on an account to stop it – to not accept any payment, let it be for foreclosure work, some type of legal action of some kind.  There's different reasons.  I just don't remember – I guess I don't remember all the reasons.  And I don't know why it was put on this account at this point in time.

(Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 125:5-10).

GMAC sent the Stop Code Checks to its legal counsel, Malcolm Cisneros.  Almost a year later, Malcolm Cisneros sent the Stop Code Checks to Ocwen pursuant to a letter dated May 9, 2013.  (Tr. Ex. 25; Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 133:13).  Another letter, dated May 13, 2013, shows that Ocwen attempted to return a check, or checks, to Polvorosa on

the basis that they were outdated.  (Tr. Ex. 53).  The letter did not, however, identify the check or checks that were purportedly enclosed.

During his testimony, Verdooren assumed that the Stop Code Checks were the ones returned in this letter.  He based his assumption on a May 13, 2013, entry in Ocwen's comment log to that effect.  (Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 133:18-23, 134:14-17, & 138:1-25; Tr. Ex. 83, Bates 3160-61).  Polvorosa testified that he did not recall receiving the Stop Code Checks.  (Apr. 11, 2019, Hearing Transcript, ECF No. 225 at 103:21-105:1). Ocwen's comment logs reflect communications with Polvorosa where he informed it that he had not received the Stop Code Checks.  (Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 139:1-141:16).  The report prepared by Polvorosa's expert, however, included a payment audit of cashier's checks Polvorosa submitted to GMAC and Ocwen.  The expert concluded that Polvorosa cashed all three of the Stop Code Checks on or about November 3, 2015.  (Tr. Ex. 133, Bates 5817).  After weighing the evidence and the credibility of the witnesses' testimony, the court finds and concludes that Polvorosa received, and cashed, the Stop Code Checks. Accordingly, the court finds that in 2012 Polvorosa failed to make six of his maintenance payments, though three of these were because GMAC had rejected the June, August and September checks tendered by Polvorosa.

Polvorosa continued to miss various monthly maintenance payments between 2013 and the entry of his discharge in July 2015.  The parties agree that he did not make the maintenance payments in February and July 2013.  (Stipulated Facts for Trial, ECF No. 217, ¶ 17).  Ocwen maintains that Polvorosa also missed the April 2013 payment, but the Payment History shows that he actually made two maintenance payments in March, 2013.  Additionally, Polvorosa paid Ocwen $10,989.00 in December 2013, which equaled the December 2013 monthly payment and the three delinquent monthly payments in 2013.  (Tr. Ex. 95, p. 3).  Effectively, Polvorosa made 12 maintenance payments in 2013, though several were late.

In 2014, Polvorosa again missed his February and July payments.  He also failed to make his April 2014 payment.  Polvorosa did make a double maintenance payment on August 11,

2014.  Overall, Polvorosa missed two maintenance payments in 2014.  (Stipulated Facts for Trial, ECF No. 217, ¶ 17).

Finally, Ocwen maintains that Polvorosa did not make his March 2015 monthly maintenance payment prior to receiving his discharge. (Tr. Ex. 95, p. 4)  The accounting does reflect, however, a $2,22.80 payment dated March 11, 2015 that Ocwen designated for a late fee payment.  (*Id*.).  All total, Polvorosa missed nine maintenance payments during the term of his Confirmed Plan.

**C. Discharge and Closing of the Bankruptcy Case.**

On March 18, 2015, the chapter 13 trustee, Kathleen A. Leavitt, filed a "Notice of Final Cure Payment" (Final Cure Notice) representing that she paid $54,933.02 to Ocwen under the Confirmed Plan to satisfy the pre-petition arrears, and that no post-petition mortgage payments were required to be paid by Polvorosa.  (Tr. Ex. 18).  The Final Cure Notice stated, in pertinent, as follows:

> Pursuant to Federal Rule of Bankruptcy Procedure 3002.1(g), within 21 days after service of this NOTICE OF FINAL CURE PAYMENT, the holder shall file and serve on 1) the debtor, 2) debtor's counsel, and 3) the trustee a statement indicating:
>
> (1) whether it agrees that the debtor has paid in full the amount required to cure the default on the claim; and
>
> (2) whether the debtor is otherwise current on all payments consistent with § 1322(b)(5) of the Code.
>
> The statement shall itemize the required cure or postpetition amounts, if any, that the holder contends remain unpaid as of the statement.  The statement shall be filed as a supplement to the holder's proof of claim and is not subject to Rule 3001(f).  Failure to respond may preclude presentment of this information in any contested matter and/or result in sanctions.

(*Id*.).

On April 8, 2015, Ocwen filed its Response to the Final Cure Notice (Final Cure Response), stating that "Debtor is contractually due for the September 1, 2014 payment with no

fees outstanding."[4]  (Tr. Ex. 98).  The Final Cure Response is capable of different interpretations.  Polvorosa argues that it should be read narrowly to mean that he was delinquent one monthly maintenance payment for September 2014.  Verdooren testified that the Final Cure Response was intended to convey that Polvorosa had made payments to catch up to September 1, 2014, and that he was behind eight payments from September 1, 2014, through April 1, 2015.  This is consistent with Ocwen's Payment History.  Verdooren admitted, however, that he did not know what the phrase "no fees outstanding" was intended to convey.  (Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 90:4-16).

Notwithstanding Ocwen's filing of the Final Cure Response, on May 8, 2015, the chapter 13 trustee filed her Final Account and Report. (ECF No. 123; Stipulated Facts, ECF No. 217, ¶ 12).  In it, she represented that she had paid $54,933.02 to Ocwen under the Confirmed Plan to satisfy pre-petition arrears.  Ocwen did not object to the chapter 13 trustee's Final Report and Account. (Stipulated Facts, ECF No. 217, ¶ 13).

On June 11, 2015, Polvorosa filed his Certificate of Compliance With Conditions Related to Entry of Chapter 13 Discharge, as required under Local Rule 3022.1, stating, in pertinent part, that he "has made all payments and completed all obligations required by the plan."  (ECF No. 124, ¶ 1; Stipulated Facts, ECF No. 217, ¶ 14).  Again, Ocwen did not challenge the Certificate of Compliance.  (Stipulated Facts, ECF No. 217, ¶ 15).

On July 16, 2015, the court entered an order discharging the debtor (Discharge Order). (Tr. Exs. 50 & 102).  Ocwen was aware of Polvorosa's discharge.  Its comment log maintained as part of Polvorosa's loan file identified the discharge in an entry dated the very next day - July 17, 2015.  (Tr. Ex. 80, Bates 2885; Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 87:3-19).

On July 20, 2015, the court entered a Final Decree closing the case.  (ECF No. 130).  As of that date, Polvorosa had made the monthly payments for May and June 2015.  Ocwen applied these payments towards the payoff of delinquencies for October and November 2014.  However, that still left Polvorosa delinquent by seven payments.

---

[4] Ocwen filed the Final Cure Response in the claims register.  No entry is found on the docket.

On July 28, 2015, Ocwen applied $2,675.18 from the suspense account to satisfy Polvorosa's delinquency for January 1, 2015. (Tr. Ex. 95, p. 5). With this applied payment, Polvorosa remained delinquent seven payments, with $2,438.89 remaining in the suspense account.

Ocwen also performed a "Bankruptcy Discharge Reconciliation" (BDR) shortly after entry of the Discharge Order. (Tr. Ex. 80, Bates 2886). The BDR reflected that as of the July 28, 2015 payment from the Suspense Account, Polvorosa had a contractual due date of January 1, 2015, meaning that Polvorosa was then behind on seven contractual mortgage payments. Polvorosa points to a line on the BDR, entitled Discharged Reconciliation Analysis Checklist, which includes a line that states: "*What post payments were not made: 07/2011, 08/2011, 09/2011, 10/2011, 11/2011, 12/2011, 01/211." (Tr. Ex. 80, Bates 2886). The BDR also notes that the proof of claim was paid in full.

The BDR does not detail the amount of the arrears for the missed monthly payments. Polvorosa calculates these amounts to be $19,367.58, comprised of $2,799.06 owed for July 2011 and $16,568.52 owed for each of the other six months. (Polvorosa's Closing Brief, ECF No. 236, p. 8). However, there is nothing in the BDR to substantiate this. More importantly, there is no evidence that Ocwen ever shared the BDR with Polvorosa or advised him that the monthly payments therein were deemed delinquent and outstanding. Povorosa nevertheless points to the BDR as evidence that Ocwen was attempting to collect debts that were discharged, namely the indebtedness on July 2011, which was on or around his Petition Date.

Verdooren testified that although the BDR listed the above dates as missed payments, that listing "was done in error." (Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 95:16-24, 101:22, & 187:5-14). He further testified that this erroneous listing of missed payments did not affect Ocwen's post-discharge accounting of Polvorosa's loan. (*Id.* at 170:11-171:1 & 189:7-190:7).

The month after entry of the Discharge Order, Ocwen sent Polvorosa a "Mortgage Account Statement" (Account Statement), which in pertinent part, included a "Reinstatement Amount" of $16,287.27 as of August 13, 2015. (Tr. Ex. 63 & Ex. 107). The Account Statement

also stated the principal balance was $137,958.38 as of August 13, 2015.  (Tr. Ex 107.)  This amount matches the principal balance listed in the Payment History as of August 13, 2015, as does the "Unapplied Funds," which matches the balance in the suspense account as of that date. With accrued interest and escrow advances, Ocwen calculated the total amount due on the loan as $140,716.09

Polvorosa directs the court's attention back to the BDR, and notes that based upon his calculation of the amounts owed for the months referenced there, the Reinstatement Amount was $3,080.31 less than what he calculated.  Polvorosa argues that this reduction is some tacit admission of wrongdoing on Ocwen's part for incorporating the discharged July 2011 payment into its BDR analysis.  The court disagrees.  The facts do not support the weight Polvorosa places on the BDR.

Verdooren testified that the term "Reinstatement Amount" as used in the document sent to Polvorosa is intended to indicate "past-due payments to bring [the account] current."  (Apr. 12, 2019, Hearing Transcript, ECF No. 226 at 101:5-7).  In short, this is the post-petition arrears, and is consistent with Ocwen's response to the Final Cure Notice.  Verdooren initially could not provide an explanation as to the discrepancy between the figures represented in the BDR and the Reinstatement Amount, other than to imply that changes in escrow amounts could have resulted in these inconsistent numbers.  (*Id*. at 100:3-105:18).  After a break in testimony, Verdooren testified that the Reinstatement Amount of $16,287.27 represented "the past due payments on the account minus that [sic] unapplied funds."  (*Id*. at 111:1-5).  Verdooren further testified that the Reinstatement Amount represented missed payments for February through August 2015.  (*Id*. at 167:11-24 & 185:13-186:23).  Verdooren also stated that the mortgage statement did not ask for any payment that would have accrued prior to the Petition Date, including the July 2011 amount identified in the BDR.  (*Id*. at 168:24-169:2).  The court credits Verdooren's explanation, though it appears that Ocwen was calculating seven past due monthly payments at $2,675.18, based on the payment amount applied on July 28, 2015, which equaled $18,726.26.  Subtracting the remaining balance of $2,438.89 from the suspense account yields $16,287.37.  Although this is slightly more than the $16,287.27 stated in the letter, the court finds that differential to be

9

irrelevant.  The salient point is that after his discharge, Ocwen sent Polvorosa a letter stating the balance of the loan, and the balance of the post-petition arrears.  Both of these amounts are consistent with its Payment History, and its explanation for its Final Cure Response.

According to Verdooren, Ocwen's file reflects that this Account Statement was the only one that Ocwen sent to Polvorosa after entry of the Discharge Order.  (*Id.* at 165:19-22).  This appears to be correct because on August 18, 2015, the servicing of the loan on the Property was transferred from Ocwen to Residential Credit Solutions.  (Stipulated Facts, ECF No. 217, ¶ 16; Tr. Ex. 49).  Ocwen also filed a "Transfer of Claim Other Than for Security" to disclose the transfer of its secured claim to Residential Credit Solutions, Inc. (ECF No. 138, *see also* Tr. Ex. 125).

Several months later, on January 27, 2016, Residential Credit Solutions notified Polvorosa that his loan was being transferred to Ditech Financial, LLC.  (Tr. Ex. 128).  Roughly a year after receiving his discharge, Polvorosa and his wife modified the loan. (Tr. Exs. 130 & 131).  The modified loan was for a balance of $143,491.49, which included $7,886.06 in past due interest, as well as $1,943.85 in taxes and $1,308.21 in insurance that Polvorosa failed to pay. (*Id.*).

**D. Polvorosa Reopens the Bankruptcy Case and Files the Motion for Sanctions.**

On September 6, 2017, Polvorosa filed a motion seeking to reopen his bankruptcy case for the purpose of seeking sanctions against Ocwen for an alleged violation of the discharge injunction.  (ECF No. 131).  The court reopened the bankruptcy case, and Polvorosa filed his initial motion against Ocwen alleging a violation of the discharge injunction.  (ECF No. 135). On December 7, 2018, Polvorosa filed his Amended and Reurged Motion for Sanctions and Request for Evidentiary Hearing for Violation of Plan Confirmation Order (Restated Motion) against Ocwen, which added a claim alleging that Ocwen also violated the terms of the Confirmation Order.  (ECF No. 175).

On April 11 and 12, 2019, the court held an evidentiary on the Restated Motion.  The court heard the testimony of Polvorosa, Rosalina Polvorosa, Emily Polvorosa, and Benjamin Verdooren.  Several exhibits were admitted at trial, either by the court or pursuant to the parties'

10

stipulation, as more fully identified in the official transcripts of the evidentiary hearing contained at ECF Nos. 225 and 226. Polvorosa contends that Ocwen violated both the Confirmation Order and the discharge injunction. The matter was stayed pending the United States Supreme Court's decision in *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1800 (2019). The court offered the parties the opportunity to file supplemental briefs to address this decision, but the parties elected not to pursue supplemental briefing. Accordingly, the matter was taken under submission.

## ANALYSIS

To support a contempt finding, Polvorosa must show by clear and convincing evidence that Ocwen "'violated a specific and definite order of the court.'" *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1190–91 (9th Cir. 2003) (quoting *Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1069 (9th Cir. 2002)). Polvorosa must demonstrate that Ocwen was put on notice of the terms of the order "and the fact that [it] would be sanctioned if [it] did not comply." *Hansbrough v. Birdsell (In re Hercules Enters., Inc.)*, 387 F.3d 1024, 1028 (9th Cir. 2004). As the Supreme Court has noted, "civil contempt is a severe remedy and . . . principles of basic fairness requir[e] that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Taggart*, 139 S. Ct. at 1801-02 (citations and internal quotation marks omitted). Thus, civil contempt sanctions should be imposed only when "there is no fair ground of doubt as to whether the order barred the creditor's conduct. In other words, . . . if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful." *Id*. at 1799. Generally speaking, this "fair ground of doubt standard" is an objective one. *Id*. at 1802. Even so, *Taggart* explained that the alleged contemnor's subjective beliefs were not wholly irrelevant because the contemnor's subjective bad faith could serve as an alternative basis to support a contempt finding. *Id*. Furthermore, an absence of bad faith might serve as a mitigating circumstance when the court considers what amount of civil contempt sanctions to impose. *Id*.

As previously noted, Polvorosa offers two bases for his contempt motion: alleged violations of the Confirmation Order and the discharge injunction. The court discusses each in turn.

**A.  Ocwen Did Not Violate the Confirmation Order.**

It is generally accepted that provisions of a confirmed plan may support a finding of contempt.  *See Deed & Note Traders, L.L.C. v. America's Serv. Co. (In re Deed & Note Traders, L.L.C.)*, 2018 WL 1354328, at *9 (B.A.P. 9th Cir. March 14, 2018) ("The bankruptcy court has the authority to hold a party in contempt for violating a court order such as the Second Confirmation Order, and impose civil contempt sanctions under § 105(a).").  As Polvorosa notes, a confirmed plan imposes a new contractual relationship upon the debtor and his or her creditors.  Polvorosa also correctly notes that § 1322(b)(5) permits a chapter 13 debtor to propose and confirm a plan that cures arrears on a secured debt, while maintaining the ongoing post-confirmation monthly payments.  His Confirmed Plan proposed such an arrangement.  As successor in interest to GMAC, Ocwen assumed these revised contractual obligations when it assumed the servicing for Polvorosa's loan from GMAC post-confirmation.

Polvorosa argues that Ocwen failed to properly account for the payments made under the Confirmed Plan.  He contends that "a mortgagee is required to apply regular payments made during the pendency of the Chapter 13 case to the current payments due and owing, and the arrearage payments from the Chapter 13 trustee to the prepetition arrears.  Failure to properly account for payments in this manner renders the mortgagee in violation of the confirmation plan provisions, and thus the confirmation order."  (Polvorosa's Closing Brief, ECF No. 236, at p. 14:12-15) (citations omitted).

In support of this broad proposition, Polvorosa cites to *In re Rathe*, 114 B.R. 253 (Bankr. D. Idaho 1990).  In *Rathe*, the debtors confirmed a plan that, like the Confirmed Plan, provided cure payments through the chapter 13 trustee and the future ongoing maintenance payments directly to the lender.  The secured creditor's successor-in-interest objected to the final accounting and claimed it was owed additional funds arising post-confirmation.  The court denied the creditor's objection, finding that the debtors had complied with all of their conduit and direct payment obligations as identified under their confirmed plan.  The creditor nevertheless sought additional recovery from the debtors after entry of their discharge.  In response, the debtors sought an injunction against the creditor.  The bankruptcy court again

rejected the creditor's claims for additional charges, noting that no request for approval of

additional charges was ever filed in the bankruptcy case prior to entry of the discharge.  As in

this case, the creditor in *Rathe* applied payments to the earliest payments due rather than those

coming due during debtors' confirmed plan.  The bankruptcy court rejected the contention that

this accounting method justified the imposition of additional fees and charges:

> The purpose of a Chapter 13 plan is to allow a debtor to pay
> arrearages during the pendency of the plan while continuing to
> make payments at the contract rate.  Payments made during the
> pendency of the Chapter 13 plan should have been applied by
> Union Federal to the current payments due and owing with the
> arrearage amounts to be applied to the back payments.  Union
> Federal cannot utilize its accounting procedures to contravene the
> terms of a confirmed Chapter 13 plan and the Bankruptcy Code.

*Id*. at 257.  *Rathe*, however, was limited to the creditor's request for additional fees.  It did not

consider whether the creditor's application of payments comprised contempt.

The First Circuit Court of Appeals examined that question in *Ameriquest Mtg. Co. v.

Nosek (In re Nosek)*, 544 F.3d 34 (1st Cir. 2008).  There, the chapter 13 debtor confirmed a plan

that also proposed a cure and maintenance payment schedule on account of a mortgage loan.

During the term of the plan, the debtor discovered that her creditor was not applying her

payments as she believed was required under her plan.  The debtor maintained that her plan

required the creditor to distinguish between pre- and post-petition payments.  However, the

creditor explained that it used a "computer program [that] sought to match up any payment

received, regardless of the source, to the oldest contractual obligation due.  If the amount

received did not meet the amount due on a single payment, the payment was placed in suspense

until, in theory, enough money was collected from the debtor to satisfy a payment."  *Id*. at 39.

The creditor further explained that the suspense account was "a type of 'collection bucket' to

hold funds until they can be apportioned to the oldest outstanding contractual payment."  *Id*.

The First Circuit held that neither § 1322(b), nor the confirmed plan, supported a finding

of contempt.  As in this case, the plan in *Nosek* provided only that the debtor would continue to

make the ongoing maintenance payments directly to the secured creditor and the arrears would

be cured by making monthly plan payments and did not otherwise direct creditor to apply the

payments in any particular manner.  The First Circuit recognized that this fell far short of the

specific and definite language needed to sustain a claim of contempt:

> [T]his language does not place any specific obligations on
> Ameriquest, accounting or otherwise.  Although we agree that the
> statement must be read in light of the purposes of § 1322(b)(5) and
> Chapter 13 more generally—that a debtor can cure a default by
> paying off her pre petition-arrearages in a reasonable amount of
> time—this purpose alone does not change the nature of appellant's
> obligations in this case.  The Plan language says nothing about
> how Ameriquest must account for pre- and post-petition payments
> during the course of the repayment period if payments are short,
> late, or not made at all.  Simply put, the terms of the Plan itself do
> not provide the specificity required to invoke the enforcement
> authority of § 105(a).

*Id*. at 47.

The First Circuit further explained that "even if the [creditor's] Payment History could

somehow be construed as a threat to [the debtor's] right to cure, the proper response of the

bankruptcy court would have been an amendment to the Plan specifying the accounting practices

necessary to eliminate that threat."  *Id*. at 48.  Importantly, such requirements would not run

afoul of the anti-modification provisions contained in § 1322(b)(2).  *Id*.; *see also Monroy v.*

*Hannon (In re Monroy)*, 650 F.3d 1300 (9th Cir. 2011) (chapter 13 plans that imposed additional

reporting and communication requirements on secured creditors did not violate § 1322(b)(2)).

Still, the First Circuit was not unsympathetic to the debtor's situation.  It noted that the

bankruptcy court's concerns as to the creditor's accounting issues were legitimate and troubling.

*In re Nosek*, 544 F.3d at 49.  But it concluded that these concerns could not support contempt

where there was no specific language in the confirmed plan, or in § 1322(b), that addressed how

the creditor was required to apply the payments it received under the plan.  *Id*.

The Bankruptcy Appellate Panel for the First Circuit applied *Nosek* to a case not unlike

the one presently before this court.  In *Pittner v. Castle Peak 2011-1 Loan Trust*, 2018 WL

914691 (B.A.P. 1st Cir. Feb. 1, 2018), the debtor confirmed a chapter 13 plan that crammed

down the value of a rental property and merely restated the principal amount, interest rate, term,

and monthly payment.  Several years after the case had been closed, the debtor reopened the case

14

and filed an adversary action seeking civil contempt against the secured creditor for rejecting payments and refusing to speak with him. The debtor asserted the creditor had violated the confirmed plan and order. On appeal, the BAP examined the confirmation order and found that "it did not contain 'specific and definite language' requiring the Appellees to 'do or refrain from any specific acts.'" *Id*. at 11. Turning to the confirmed plan, the BAP further found that it "does not contain any concrete directives that the Appellees accept payments from the Debtor or that they must communicate with him regarding the loan." *Id*. Undeterred, the debtor argued that such requirements should be inferred from the plan and the parties' course of conduct. The BAP was not persuaded:

> The "inferences" the Debtor contends the bankruptcy court should have made about the Operative Plan fall far short of the "clear and unambiguous" standard the Debtor had to meet for a finding of contempt. Like the Property Provision, the other provisions of the Operative Plan he highlights are silent regarding the Appellees' obligations to the Debtor. Even when considered as a whole, the Operative Plan still does not contain any "specific and definite language" that requires the Appellees to accept payments from the Debtor or to communicate with him post confirmation about the debt, or for that matter, to do or refrain from doing anything.

*Id*. at 12.

The First Circuit's reasoning in *Nosek* is consistent with the requirements that Polvorosa prove a violation of a specific and definite provision of an order to establish contempt. Polvorosa's plan required him to make cure and maintenance payments. It did not direct how those payments were to be applied. It could have, but it did not. Absent clear requirements in either the Confirmation Order or the Confirmed Plan, Polvorosa has failed to prove a violation of a specific and definite order of the court. Therefore, Polvorosa has failed to prove contempt based on Ocwen's allocation of loan payments received under the Confirmed Plan.

**B. Miscellaneous Arguments Concerning the Confirmation Order.**

**1. Ocwen Did Not Violate the Confirmation Order by Failing to Apply the Stop Code Checks.**

Polvorosa also argues that the failure to accept and credit the Stop Code Checks violated the Confirmed Plan, and, therefore, the Confirmation Order. He contends that under Nevada

law, his payment obligation for those months was discharged upon tender of the payments to GMAC. He further contends that Ocwen should have identified these issues in a proper bankruptcy reconciliation analysis.[5]

Again, Polvorosa identifies no clear and definite language in either the Confirmed Plan or the Confirmation Order that have been violated. Moreover, it was GMAC that refused to apply the Stop Code Checks. Ocwen did not assume service of the loan until November 21, 2012, at the earliest. In short, Polvorosa argues that Ocwen must be found in contempt for GMAC's refusal to apply the Stop Code Check. Polvorosa has failed to establish that Ocwen violated the Confirmation Order with regard to the Stop Code Checks. The discharge of the payments tendered by Polvorosa and rejected by GMAC is a separate issue from the contempt addressed elsewhere in this decision.

**2. The BDR Did Not Violate the Confirmation Order.**

Polvorosa also argues that Ocwen is guilty of civil contempt for creating the BDR shortly after entry of the Discharge Order. He argues that contempt is appropriate because after entry of his discharge Ocwen incorrectly stated that Polvorosa failed to make the monthly maintenance payments from July through December 2011. Polvorosa reasons that Ocwen violated the Confirmation Order because it failed to credit his actual payments, which thereafter resulted in his loan being placed into foreclosure status.

Ocwen, via Verdooren's testimony, admits that the representations in the BDR were incorrect. But Polvorosa failed to establish that Ocwen ever relied upon the BDR, or the specific reference Polvorosa relies on. Rather, the BDR was an internal document. Finally, it bears mentioning that Polvorosa admittedly missed post-petition monthly payments and was delinquent in some amount when Ocwen placed his loan into foreclosure status. Polvorosa failed to prove that Ocwen violated any court order simply by running an analysis that generated an untrue statement of default that was not relied upon in dealing with his account.

//

---

[5] Polvorosa also contends that there is no evidence to show when Ocwen returned those checks to him. The court disagrees for reasons previously stated. *See* pp. 4-5, supra.

**C. Ocwen Did Not Violate the Discharge Injunction.**

Polvorosa also argues that Ocwen violated the discharge injunction by attempting to collect discharged debts. Once the bankruptcy court enters its discharge order, it "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [prepetition] debt as a personal liability of the debtor...." 11 U.S.C. § 524(a)(2); *see also Taggart*, 139 S. Ct. at 1800 ("The words of the discharge order, though simple, have an important effect: A discharge order 'operates as an injunction' that bars creditors from collecting any debt that has been discharged."). A bankruptcy court may hold a creditor in contempt for violating the discharge injunction. *Taggart*, 139 S. Ct. at 1799.

There is no dispute that Ocwen knew about the entry of the Discharge Order or its effect barring collection of any discharged debt. The question, instead, is what discharged debt did Ocwen allegedly attempt to collect? Ocwen sent only one post-discharge statement to Polvorosa before its loan servicing duties were transferred to Residential Credit Solutions. Polvorosa argues that Ocwen violated the discharge injunction because, based on the BDR previously discussed, it was attempting to collect pre-petition arrears due from July 2011.

This argument, again, is premised on the BDR and is squarely contradicted by the facts of the case. Ocwen has never denied that Polvorosa paid off the prepetition arrears through the conduit payments made under his Confirmed Plan. While Polvorosa generally objects to Ocwen's application of the cure and maintenance payments, Ocwen's Payment History as of entry of the Discharge Order clearly establishes that it acknowledged, and documented, that the prepetition arrears had been fully "cured" through the plan payments. However one may read Ocwen's response to the trustee's Notice of Final Cure Payment, it clearly states a post-petition deficiency.

Ocwen's Payment History details its calculation as to how Polvorosa was still delinquent for seven post-petition maintenance payments. The court has spent considerable time reviewing the Payment History and the parties' contentions. Having completed that review, the court agrees with Ocwen, and its Payment History. Setting aside Ocwen's rejection of the Stop Code

17

Checks, Polvorosa was delinquent seven payments at the time the bankruptcy court entered the Discharge Order.

That Ocwen was attempting to collect post-petition, post-confirmation maintenance payments upon completion of a chapter 13 plan is significant. Pursuant to § 1328(a)(1), long-term debt is not subject to discharge in a chapter 13 case. *See* 11 U.S.C. § 1328(a)(1) (excepting from the chapter 13 discharge debts "provided for under section 1322(b)(5)"); *see also Meyer v. Wells Fargo Bank, N.A. (In re Meyer),* 2018 WL 1663292, at *13 (Bankr. M.D. Pa. Apr. 4, 2018) (stating that "a claimant cannot violate a discharge injunction under § 524(a) with regard to claims provided for under § 1322(b)(5)"); Keith M. Lundin, Lundin On Chapter 13, § 158.7, at ¶ [9], LundinOnChapter13.com (last visited August 19, 2020) (observing that "after completion of [§ 1322(b)(5)] payments under the plan, amounts due by contract that have not been paid through the plan are excepted from discharge by § 1328(a)(1)") (emphasis added). Polvorosa does not deny that these maintenance payments were long-term debts under § 1322(b)(5). And even he admits that he missed at least four post-petition maintenance payments. Ocwen was attempting to collect the post-petition balance owed on its secured loan.[6]

The court finds nothing improper with Ocwen's post-discharge Account Statement. Polvorosa was attempting to cure and reinstate his home loan. He cured the prepetition arrears

---

[6] The Bankruptcy Appellate Panel's recent decision in *Derham-Burk v. Mrdutt (In re Mrdutt)*, 600 B.R. 72 (B.A.P. 9th Cir. 2019), raises an interesting question regarding the effect of the discharge in light of Polvorosa's obligation to make his maintenance payments. *Mrdutt* concluded that payment of all maintenance payments was a prerequisite for entry of a chapter 13 discharge even if such payments are made directly to the secured creditor. *Id.* at 81. In this case, however, Polvorosa received his discharge though he had not made all of his maintenance payments. Apart from the dischargeability of the long term debt, *Mrdut* raises a question whether entry of discharge might preclude any subsequent challenge that all payments had been made. *See generally Enewally v. Wash. Mut. Bank (In re Enewally)*, 368 F.3d 1165, 1172 (9th Cir. 2004) ("'Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to res judicata effect.'") (quoting *Trulis v. Barton,* 107 F.3d 685, 691 (9th Cir. 1995)). Though interesting, this issue does not affect the court's contempt analysis. This remains an unsettled area of the law. *See In re Rivera*, 599 B.R. 335 (Bankr. D. Ariz. 2019). As such, even if applicable, in 2015 when the discharge was entered there was a fair ground for doubt regarding the treatment of maintenance payments made directly to the secured creditor and the effect of a discharge entered when such payments were not made within the term of a chapter 13 plan.

through the Confirmed Plan. Ocwen does not deny this. But Polvorosa did not make all of his

monthly post-petition payments, and those were not discharged pursuant to § 1328(a)(1). For the

reasons detailed in the factual discussion of the accountings, the court concludes that Ocwen's

Payment History is correct. Accordingly, Ocwen's efforts to collect the post-petition arrears did

not violate the discharge injunction.

   **D. Issues Regarding Ocwen's Final Cure Response.**

        While the court finds that there is no basis for contempt, the facts of this case are still

problematic and concerning. It should not be that difficult to determine a loan balance at the end

of a chapter 13 plan. Indeed, Rule 3002.1 was adopted in 2011 in recognition that "[i]n order to

be able to fulfill the obligations of § 1322(b)(5), a debtor and the trustee have to be informed of

the exact amount needed to cure any prepetition arrearage, *see* Fed. R. Bankr. P. 3001(c)(2), *and*

*the amount of the postpetition payment obligations*." Committee Notes on Fed. R. Bankr. P.

3002.1 (emphasis added). The Rule was "added to aid in the implementation of § 1322(b)(5),

which permits a chapter 13 debtor to cure a default and maintain payments on a home mortgage

over the course of a chapter 13 plan. It applies regardless of whether the trustee or the debtor is

the disbursing agent for postpetition mortgage payments." *Id*. Specifically, subsection (f)

requires the chapter 13 trustee to give notice of a final cure payment "stating that the debtor has

paid in full the amount required to cure any default on the claim." Subsection (g) requires a

secured creditor to respond to the notice of final cure payment and state whether it agrees that all

cure payments have been made. The Rule further requires that the creditors advise

> whether the debtor is otherwise current on all payments consistent
> with § 1322(b)(5) of the Code. The statement shall itemize the
> required cure or postpetition amounts, if any, that the holder
> contends remain unpaid as of the date of the statement. The
> statement shall be filed as a supplement to the holder's proof of
> claim and is not subject to Rule 3001(f).

Fed. R. Bankr. P. 3002.1(g).

        Though subsection (f) of Bankruptcy Rule 3002.1 is directed towards cure payments,

subsection (g) and the committee notes leave no doubt that any outstanding maintenance

payments due during the plan must be reported by the secured creditor. In this instance, Ocwen

19

attempted to do so.  It properly filed a response as a supplement to its proof of claim, and stated

that there was an outstanding post-petition arrearage.  It did not, however, include an itemization

of the outstanding amounts as required or state the amount of post-petitition delinquency.  The

chapter 13 trustee, Polvorosa, and Ocwen apparently never gave this issue any further attention.

The chapter 13 trustee simply proceeded to file her Final Account & Report, and Ocwen failed to

object to the same.  As a result, Polvorosa signed and filed his Certificate of Compliance

required by Local Bankruptcy Rule 5009(b)(3), in which he certified:

> The Chapter 13 Trustee has filed and served the Trustee's Final
> Account & Report-Completed Case and no objections were timely
> filed or any objection to the Final Account & Report-Completed
> Case has been resolved or adjudicated. **The Debtor has made all**
> **payments and completed all obligations required by the plan.**
> The Debtor believes that a Chapter 13 Discharge may be entered in
> this case after the objection period to the Debtor's Certificate of
> Compliance with Conditions Related to Entry of Chapter 13
> Discharge passes.

ECF No. 124 (emphasis added).  In reliance on the above, the bankruptcy court entered the

Discharge Order.  Ocwen did not challenge Polvorosa's discharge, which long ago became final.

Rule 3002.1(i) details the consequnces for the creditor's failure to respond to a notice of

final cure.  It provides that if the creditor fails to provide the information required under

subsection (g), the court may:

> take either or both of the following actions:
>
> (1) preclude the holder from presenting the omitted
> information, in any form, as evidence in any contested matter or
> adversary proceeding in the case, unless the court determines that
> the failure was substantially justified or is harmless; or
>
> (2) award other appropriate relief, including reasonable
> expenses and attorney's fees caused by the failure.

Fed. R. Bankr. P. 3002.1(i).

Polvorosa brought his motion for contempt. That motion has largely turned into an action

for an accounting and readjustment of the balance owed on the loan.  This is far afield from the

original action, but the impact of Fed. R. Bankr. P. 3002.1 has always hung over this motion.

The parties have referenced it previously and within their closing briefs.  In his closing brief,

Polvorosa requests that the court limit Ocwen to the amount of the September 2014 payment referenced in its Final Cure Response under Bankruptcy Rule 3002.1(i), and to reduce that amount further by the balance held in the suspense account. Ocwen opposes the request and argues that such relief extends beyond the scope of the Restated Motion.

The purpose of Polvorosa's request under Rule 3002.1(i) is confusing. He subsequently entered into a modification agreement with Ditech, who was servicing the loan at that time. Polvorosa and his wife signed the modification agreement on June 28, 2016. (Tr. Ex. 131, Bates 2713). Ocwen no longer has any association with Polvorosa's loan, and Ditech is not a party to these proceedings. It is unclear exactly what relief Polvorosa seeks against Ocwen. Ocwen is not attempting to collect on the loan. Rather, the loan, which was modified and restated with Ditech, is not before the court. Any relief on Polvorosa's current loan is beyond the scope of the Restated Motion.

Given Polvorosa's discussion of Rule 3002.1, it bears mention that Ocwen did respond to the Final Cure Notice under Rule 3002.1, and it did give notice that a post-petition deficiency existed – though it was not clear as to the amount of the deficiency. It also failed to itiemize the deficiency. But it was not alone in failing to meet its obligations. Polvorosa ignored Ocwen's Final Cure Response, and erroneously stated that he had made all his required payments. Similarly, the chapter 13 trustee proceeded to conclude the case despite Ocwen's Final Cure Response.

Polvorosa's discussion of Rule 3002.1 does not affect the court's contempt analysis. The court finds that the relief requested under Rule 3002.1 is not appropriate.

## CONCLUSION

For the reasons stated above, the debtor Antonio F. Polvorosa has failed to prove by clear and convincing evidence that Ocwen Loan Servicing, LLC knowingly violated the specific provisions of either the confirmation order or his discharge. A separate order shall be entered contemporaneously with this Memorandum Decision.

Copies sent via CM/ECF.

# # #